# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF ILLINOIS
# EAST ST. LOUIS DIVISION

| | |
|---|---|
| April Wright, individually and on behalf of all others similarly situated, | 3:22-cv-02311 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| Walmart Inc., | Jury Trial Demanded |
| Defendant | |

Plaintiff alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

1.  Walmart Inc. ("Defendant") manufactures, labels, and sells three percent hydrogen peroxide solution identified as an antiseptic promoted "For treatment of minor cuts and abrasions" under the Equate brand ("Product").



2. Dictionaries define "treat" as attempting to heal, improve or cure a condition.

3. The representation the Product should be used "for treatment of minor cuts and abrasions" tells consumers it will assist in healing by shortening healing time, when this statement is false, misleading, and not authorized by any applicable body.

4. In the context of first aid, an antiseptic is a chemical with antimicrobial activity, applied to the skin to help prevent infection in minor cuts, scrapes, and burns.

5. Following its discovery in the 1920s, hydrogen peroxide was used for a range of unrelated conditions including typhoid, diphtheria, bowel infections, eczema, epilepsy, influenzal pneumoniae, bladder infections, and even as an intravenous source of oxygen during cardiopulmonary resuscitation.

6. However, Alexander Fleming discovered that wounds treated with antiseptics like hydrogen peroxide had higher death rates and slower healing than wounds not treated at all.

7. Doctors recognize that a "dangerous medical myth [. . .] is the widespread belief by patients that copious amounts of hydrogen peroxide should be applied to treat cuts and scrapes."[1]

8. While the back panel Drug Facts contains the authorized statement the Product can be "Use[d] [as] first aid to help prevent the risk of infection in minor cuts, scrapes, and burns," this function is distinct from "treatment of minor cuts and abrasions," which it is not authorized to claim.

---

[1] Michael Daignault, M.D., "Everyone puts hydrogen peroxide on their wounds. They really shouldn't." USA TODAY, Feb. 2, 2022; Roger on Tuesday, Medical Myth Buster: Hydrogen Peroxide and Wounds, Atlantic Feet, June 9, 2015; Aviva Patz, 9 First Aid Mistakes You're Probably Making, Prevention.com, July 2, 2015.



9. While hydrogen peroxide's antiseptic properties can help clean a cut and initially reduce the number of bacteria at a wound, the Mayo Clinic and numerous medical studies advise that it does not help treat minor cuts and abrasions.[2]

10. This is because no credible evidence supports a connection between the number of bacteria and reduction in healing time of a clean wound.

11. In fact, the caustic properties of hydrogen peroxide negatively affects healthy cells involved in wound healing.

12. Minor skin injuries of the type for which hydrogen peroxide is used are self-healing.

---

[2] Mayo Clinic Staff, Cuts and Scrapes: First aid, Nov. 17, 2021; C. J. Reid et al., "Hydrogen peroxide – a party trick from the past?," Anaesthesia and Intensive Care, 39.6 (2011): 1004-1008; Cleveland Clinic, What Is Hydrogen Peroxide Good For?, Dec. 1, 2021.

13. When the skin suffers cuts, burns, scrapes or abrasions, the body's platelets release fibrin to form a clot and seal the wound.

14. White blood cells, or macrophages, rush to the area and destroy bacteria that gets past the clot and oversee the repair process.

15. These macrophages also secrete growth factors which help repair the wound.

16. Blood vessels then dilate to allow fresh nutrients and oxygen to flow to the area and facilitate healing.

17. Defendant makes other representations and omissions with respect to the Product which are false and misleading.

18. Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

19. Plaintiff paid more for the Product than she would have had she known the representations with respect to "treatment of minor cuts and abrasions" were false and misleading, and she would not have bought it or would have paid less.

20. As a result of the false and misleading representations, the Product is sold at a premium price, approximately no less than $1.00 for 32 fl oz, excluding tax and sales, higher than similar products represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

## Jurisdiction and Venue

21. Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

22. The aggregate amount in controversy exceeds $5 million, including any statutory and punitive damages, exclusive of interest and costs.

23. Plaintiff April Wright is a citizen of Illinois.

24. Defendant Walmart Inc. is a Delaware corporation with a principal place of business in Bentonville, Benton County, Arkansas.

25. The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen.

26. The members of the class Plaintiff seeks to represent are more than 100, because the Product has been sold with the representations described here for several years, in thousands of Defendant's stores and online, across the States covered by Plaintiff's proposed classes.

27. Venue is in this District and assignment is to the East St. Louis Division because Plaintiff resides in Randolph County and a substantial part of the events or omissions giving rise to the claims occurred here, including Plaintiff's purchase, transactions and/or use of the Product and awareness and/or experiences of and with the issues described here.

## Parties

28. Plaintiff April Wright is a citizen of Chester, Illinois, Randolph County.

29. Defendant Walmart Inc. is a Delaware corporation with a principal place of business in Bentonville, Arkansas, Benton County.

30. Walmart is an American multinational retail corporation that operates a chain of over 5,000 supercenters throughout the nation, selling everything from furniture to groceries.

31. While Walmart sells leading national brands, it also sells a large number of over-the-counter ("OTC") pharmaceutical products under its private label Equate brand.

32. Private label products are made by third-party manufacturers and sold under the name of the retailer, or its sub-brands.

33. Previously referred to as "generic" or "store brand," private label products have

increased in quality, and often are superior to their national brand counterparts.

34. Products under the Equate brand have an industry-wide reputation for quality and value.

35. In releasing products under the Equate brand, Defendant's foremost criteria was to have high-quality products that were equal to or better than the national brands.

36. Defendant is able to get national brands to produce private label Equate products due its loyal customer base and tough negotiating.

37. That Equate branded products met this high bar was proven by focus groups, which rated them above the name brand equivalent.

38. Private label products generate higher profits for Defendant because national brands spend significantly more on marketing, contributing to their higher prices.

39. A survey by The Nielsen Co. "found nearly three out of four American consumers believe store brands are good alternatives to national brands, and more than 60 percent consider them to be just as good."

40. Private label products under the Equate brand benefit by their association with consumers' appreciation for the Walmart brand as a whole.

41. Plaintiff purchased the Product at locations including Walmart, 2206 State St, Chester, IL 62233, between September 28, 2020, and September 28, 2022, among other times.

42. Plaintiff believed and expected the Product could treat minor cuts and abrasions because that is what the representations and omissions said and implied, on the front label and the absence of any references or statements elsewhere.

43. Plaintiff relied on the words, terms coloring, descriptions, layout, placement, packaging, and/or images on the Product, on the labeling, statements, omissions, claims, and

instructions, made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Product and separately, through in-store, digital, audio, and print marketing.

44. Plaintiff bought the Product at or exceeding the above-referenced price.

45. Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, requirements, instructions, features, and/or components.

46. Plaintiff paid more for the Product than she would have paid based on the false and misleading statements and omissions, and it was worth less than represented because its composition and/or abilities were not consistent with what it said.

47. Plaintiff intends to, seeks to, and will purchase the Product again when she can do so with the assurance its representations are consistent with its abilities, attributes, and/or composition.

48. Plaintiff is unable to rely on the labeling and representations not only of this Product, but other antiseptics, because she is unsure whether those representations are truthful.

Class Allegations

49. Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Illinois Class:** All persons in the State of Illinois who purchased the Product during the statutes of limitations for each cause of action alleged; and
>
> **Consumer Fraud Multi-State Class**: All persons in the States of Alaska, Montana, Wyoming, Arkansas, Idaho, Kentucky, West Virginia, Kansas, Iowa, Mississippi, Nebraska, and Utah who purchased the Product during the statutes of limitations for each cause of action alleged.

50. Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled

to damages.

51. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

52. Plaintiff is an adequate representative because her interests do not conflict with other members.

53. No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

54. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

55. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

56. Plaintiff seeks class-wide injunctive relief because the practices continue.

<u>Illinois Consumer Fraud and Deceptive Business Practices Act
("ICFA"), 815 ILCS 505/1, *et seq.*</u>

57. Plaintiff incorporates by reference all preceding paragraphs.

58. Plaintiff relied on the representations and omissions to believe the Product could treat minor cuts and abrasions.

59. Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Violation of State Consumer Fraud Acts
(Consumer Fraud Multi-State Class)</u>

60. The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or deceptive business practices in the conduct of commerce.

8

61. The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

62. The members of the Consumer Fraud Multi-State Class were misled similarly to Plaintiff with respect to their expectations the Product could treat minor cuts and abrasions.

Breaches of Express Warranty,
Implied Warranty of Merchantability/Fitness for a Particular Purpose
and Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*

63. The Product was manufactured, identified, marketed, and sold by Defendant and expressly and impliedly warranted to Plaintiff that it could treat minor cuts and abrasions.

64. Defendant directly marketed the Product to Plaintiff through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, distributed product descriptions, and targeted digital advertising.

65. Defendant knew the product attributes that potential customers like Plaintiff were seeking and developed its marketing and labeling to directly meet those needs and desires.

66. Defendant's representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant that it could treat minor cuts and abrasions.

67. Defendant's representations affirmed and promised that the Product could treat minor cuts and abrasions.

68. Defendant described the Product so Plaintiff believed it could treat minor cuts and abrasions, which became part of the basis of the bargain that it would conform to its affirmations and promises.

69. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

70. This duty is based on Defendant's outsized role in the market for this type of Product, a trusted company, known for transparent labeling and a commitment to putting customers first.

71. Plaintiff recently became aware of Defendant's breach of the Product's warranties.

72. Plaintiff provides or will provide notice to Defendant, its agents, representatives, retailers, and their employees that it breached the Product's express and implied warranties.

73. Defendant received notice and should have been aware of these issues due to complaints by third-parties, including regulators, industry bodies, competitors, and consumers, to its main offices, and by consumers through online forums.

74. The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

75. The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container, or label, because it was marketed as if it could treat minor cuts and abrasions.

76. The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because she expected it could treat minor cuts and abrasions, and she relied on Defendant's skill and judgment to select or furnish such a suitable product.

Negligent Misrepresentation

77. Defendant had a duty to truthfully represent the Product, which it breached.

78. This duty was non-delegable, based on Defendant's holding itself out as having

special knowledge and experience in this area, custodian of the Equate brand, recognized for the highest quality OTC products that exceed their national brand counterparts.

79. Defendant's representations and omissions regarding the Product went beyond the specific representations on the packaging, as they incorporated the extra-labeling promises and commitments to quality, transparency, and putting customers first, that it has been known for.

80. These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

81. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

82. Plaintiff reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, her purchase of the Product.

### Fraud

83. Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it could treat minor cuts and abrasions.

84. The records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of the falsity and deception, through statements and omissions.

### Unjust Enrichment

85. Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

    **WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing Defendant to correct the challenged practices to comply with the law;

3. Awarding monetary damages, including statutory and/or punitive damages and interest pursuant to statutory and common law claims;

4. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

5. Other and further relief as the Court deems just and proper.

Dated:   October 6, 2022

                                                                Respectfully submitted,

                                                                /s/Spencer Sheehan
                                                                Sheehan & Associates, P.C.
                                                                60 Cuttermill Rd Ste 412
                                                                Great Neck NY 11021
                                                               (516) 268-7080
                                                              spencer@spencersheehan.com